UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **EDCV 21-807 JGB (SHKx)** | Date | March 10, 2023 |
|---|---|---|---|
| Title | *Dora Higgins, et al. v. County of San Bernardino, et al.* | | |

| Present: The Honorable | JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE |
|---|---|

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

**Proceedings:** Order (1) GRANTING Defendants' Motion for Summary Judgment (Dkt. No. 49); and VACATING the March 13, 2023 Hearing (IN CHAMBERS)

Before the Court is Defendants' amended motion for summary judgment, or in the alternative, summary adjudication. ("Motion," Dkt. No. 49.) The Court determines this matter appropriate for resolution without a hearing. See Fed. R. Civ. P. 78; L.R. 7-15. After considering the papers filed in support of and in opposition to the Motion, the Court **GRANTS** the Motion. The March 13, 2023 hearing is **VACATED**.

## I.   BACKGROUND

On February 19, 2021, Plaintiffs Dora Higgins and Vinson Higgins, as court-appointed conservators for Latesha Denise Smith (jointly, "Plaintiffs"), filed a complaint in San Bernardino County Superior Court. ("Complaint," Dkt. No. 1-4.) On May 6, 2021, Defendants County of San Bernardino ("County") and San Bernardino County Sherriff's Department ("SBSD") (jointly, "Defendants") removed to this Court. ("Notice of Removal," Dkt. No. 1.) On June 14, 2021, Plaintiffs filed a first amended complaint against Defendants and Does 1 through 20. ("FAC," Dkt. No. 8.) The FAC asserts two claims for relief: (1) negligence and (2) deprivation of civil rights under 42 U.S.C. § 1983 ("Section 1983"). (See FAC.) On June 23, 2021, Defendants answered. ("Answer," Dkt. No. 10.)

On December 29, 2022, the parties stipulated to dismiss the first claim for relief for negligence and the second claim for relief under Section 1983 only as to an excessive force theory

of liability.  ("Stipulation," Dkt. No. 35.)  Plaintiffs did not dismiss any other theories of liability under Section 1983.  (Id.)  On January 10, 2023, the Court approved the stipulation and dismissed those claims with prejudice.  (Dkt. No. 44.)

On January 11, 2023, the Court set a briefing schedule for any dispositive motion(s) in this case.  ("Briefing Schedule," Dkt. No. 45.)  Pursuant to the Briefing Schedule, Defendants filed a motion for summary judgment on February 13, 2023.  (Motion.)  In support of the Motion, Defendants submitted a statement of undisputed material facts ("Def. Facts," Dkt. No. 49-1), declarations, and various exhibits ("Def. Exs. A–X," Dkt. No. 49-9–32.)  Defendants also filed a request for judicial notice.[1]  ("RJN," Dkt. No. 50.)  On February 20, 2023, Plaintiffs opposed the Motion.  ("Opposition," Dkt. No. 52.)  In support of the Opposition, Plaintiffs submitted a statement of genuine disputed material facts and statement of undisputed material facts ("Pl. Facts," Dkt. No. 53-10), a declaration of Dora Higgins ("Higgins Decl.," Dkt. No. 53), a declaration of Nancy J. Sandoval ("Sandoval Decl.," Dkt. No. 53-1), and various exhibits ("Pl. Exs. A–H," Dkt. No. 53-2-9.)  On February 27, 2023, Defendants replied.  ("Reply," Dkt. No. 54.)  On the same day, Defendants filed objections to Plaintiffs' additional evidence.  ("Objections," Dkt. No. 55.)

## II. FACTS

### A. Evidentiary Objections

"A trial court can only consider admissible evidence in ruling on a motion for summary judgment."  Orr v. Bank of America, NT & SA, 285 F.3d 764, 773 (9th Cir. 2002); see Fed. R. Civ. Proc. 56(e).  At the summary judgment stage, courts consider evidence with content that would be admissible at trial, even if the form of the evidence would not be admissible at trial.  See, e.g., Fraser v. Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003).  The Court considers Defendants' objections only where necessary.[2]  (See Objections.)  All other objections are **OVERRULED AS MOOT**.

//

---

[1] Defendants request judicial notice of the consent decree in Turner v. County of San Bernardino, Case No. 5:16-CV-00355-VAP (DTBx), which was approved by the court on December 14, 2018.  (See RJN.)  Because the Court "may take judicial notice of court filings and other matters of public record," the Court **GRANTS** the RJN.  See Reyn's Pasta Bella, LLC v. Visa USA, Inc., 442 F.3d 741, 746 n.6 (9th Cir. 2006).

[2] "[O]bjections to evidence on the ground that it is irrelevant, speculative, and/or argumentative, or that it constitutes an improper legal conclusion are all duplicative of the summary judgment standard itself" and are thus "redundant" and unnecessary to consider here.  Burch v. Regents of Univ. of Cal., 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006); see also Anderson, 477 U.S. 242, 248 (1986) ("Factual disputes that are irrelevant or unnecessary will not be counted.").

B.   **Undisputed Facts**

The following material facts are sufficiently supported by admissible evidence and are uncontroverted, except as noted. These material facts are "admitted to exist without controversy" for purposes of the Motion. See Fed. R. Civ. P. 56(e)(2); L.R. 56-3.

On January 5, 2019, Latesha Denise Smith ("Ms. Smith") was arrested and booked into the West Valley Detention Center ("West Valley"). (Def. Facts ¶ 1.) When Dora Higgins ("Ms. Higgins") was informed of Ms. Smith's arrest, Ms. Higgins advised a deputy that Ms. Smith had mental health issues.[3] (Id. ¶ 5.)

On the day of her arrest, Ms. Smith was evaluated by multiple healthcare providers. (Id. ¶¶ 8–11.) Two registered nurses at West Valley designated Ms. Smith as Seriously Mentally Ill Lockdown ("SMIL") and placed her in Unit 15, a sheltered housing unit for inmates with severe mental illness. (Id. ¶¶ 10–13.) One nurse noted in Ms. Smith's medical records:

> UTA for MH status due to refusing to cooperate and answer any questions. Observed pacing around cell with a hostile and menacing look, intermittently rolls her eyes up in her head, waving her arms around and making aggressive gestures toward the nurse and deputies. I/M making very strange movements and gestures similar to the dancing, slapping/drumming motions seen in voodoo rituals and hissing like a snake. Bangs aggressively on cell window and walls with fists and open hands when staff attempt to engage with her. I/M made shooting gestures at white male deputies, current incarceration for setting an establishment on fire and attempting to set fire to the reporting party as well as assaulting them. Has multiple past charges of extreme assaultiveness and a past murder charge in another state.

(Pl. Facts ¶ 5.) On January 9, 2019, a staff member determined that Ms. Smith was "not clinically stable to transport" to court and doing so could "jeopardize . . . her health or the health of others." (Id. ¶ 15.)

On January 15, 2019, Ms. Smith received a full mental health evaluation, during which she denied any current suicidal ideation or past ideation or attempts. (Def. Facts ¶ 15.) On January 17, 2019, Ms. Smith was seen by a psychiatrist. (Id. ¶ 16.) The psychiatrist prescribed Ms. Smith medications, but acknowledged that Ms. Smith had a right to refuse the medications. (Id. ¶¶ 18–19.) The psychiatrist diagnosed Ms. Smith with unspecified psychosis not due to substance abuse or known physiological condition. (Pl. Facts ¶ 16.) At this time, there was no indication that Ms. Smith would harm herself. (Def. Facts ¶ 21.) On January 19, 2019, at the

---

[3] The parties dispute whether Ms. Higgins told the deputy that Ms. Smith had previously been hospitalized due to her severe mental illness. (Compare Higgins Decl. ¶ 5 with Def. Ex. T.)

request of the deputies, Ms. Smith was evaluated by a mental health clinician.[4] (Id. ¶ 22.) Due to her aggressive behavior, it was determined that Ms. Smith would be housed alone. (Id. ¶ 24.)

On January 29, 2019, Ms. Smith was evaluated by a psychiatrist and denied any suicidal ideation. (Id. ¶ 26.) The next day, a clinical therapist followed up and Ms. Smith again denied any suicidal thoughts or plans. (Id. ¶ 27.) The next week, on February 7, 2019, the psychiatrist followed up. (Id. ¶ 28.) Ms. Smith did not want to speak with the psychiatrist but did not present any signs of suicide risk. (Id. ¶ 29.) On February 13, 2019, Ms. Smith was evaluated by a nurse to determine if she should remain in SMIL. (Id. ¶ 30.) There was no indication that Ms. Smith was a danger to herself. (Id. ¶ 31.) A few days later on February 16, 2019, a mental health therapist was called by the deputies because Ms. Smith would not return to her cell. (Id. ¶ 32.) Ms. Smith was calm and cooperative with the therapist. (Id. ¶ 33.) On February 21, 2019, Ms. Smith was again evaluated by a psychiatrist and determined not to be a threat to herself. (Id. ¶ 34.) On February 25, 2019, a clinical therapist observed that Ms. Smith appeared distracted and confused, but did not believe that Ms. Smith was a danger to herself. (Id. ¶ 36.)

On March 4, 2019, a clinical therapist was called to assess Ms. Smith who had removed her clothing and refused to return to her cell. (Id. ¶ 37.) The therapist noted in Ms. Smith's medical records:

> CT met with PT for OD call in attorney's booth to assess safety, stability, and suicidality. PT was uncooperative and did not seem to be oriented to time, place or situation. PT affect, and mood was congruent but inappropriate. PT appeared to be manic as evidenced by PT tangential speech, hypersexual behavior towards CT and deps, and disrobing of clothing and refusing to dress. PT appeared to be delusion as evidenced by PT stating "They tried to serve me cannibalism in here. My roommate told me, but I didn't believe her until I seen the food. That's when I know I could not trust them with giving me clean clothing." PT placed breasts on door window stating "Are these raisins? Someone told me they are raisins." CT was unable to assess PT eating or sleeping routine, SI/HI, or AH/VH. However, ***PT did not appear to be a danger to herself or others and would not meet criteria for SW [suicide watch] at this time***.

(Pl. Facts ¶ 17 (emphasis added)). A few days later on March 7, 2019, a psychiatrist followed up with Ms. Smith. (Id. ¶ 39.) She was uncooperative, but there was no indication that she was a danger to herself. (Id. ¶ 40.)

---

[4] Defendant's expert, Dr. Alan Abrams, testified that he saw one instance in Ms. Smith's medical records dated January 19, 2019 where the box for severe suicidal ideation was checked. (See Pl. Facts ¶ 27.) The parties dispute whether this box was incorrectly checked by the mental health clinician who completed the form. (See Objections ¶ 27.) Neither the form nor any testimony from the mental health clinician who checked the box is before the Court at this time.

On March 14, 2019, a clinical therapist visited Ms. Smith. (Id. ¶ 41.) The therapist noted: "Clinician attempted to meet with patient to assess mental health needs and to offer continuation of care. Patient was lying on her bed covered by her blanket. . . . Clinician attempted to engage patient several times but patient refused. Patient's cell smelled odorous." (Pl. Facts ¶ 19.) On March 21, 2019, the same therapist visited Ms. Smith again. (Id. ¶ 20.) The therapist noted: "Patient was talking to herself and refused to engage with clinician. Patient did not make eye contact and continued to talk/sing/yell to self after clinician attempted to engage patient several times." (Id.)

Ms. Smith was last seen by the psychiatrist on April 4, 2019, when she was observed to be laughing and mumbling incoherently. (Def. Facts ¶ 44.) At that time, the psychiatrist did not observe any signs that Ms. Smith was a danger to herself, but did start her on a new medication, explaining the risks and benefits. (Id. ¶ 45.) On April 9, 2019, the day before her suicide attempt, Ms. Smith met with a clinical social worker to discuss her release plan. (Id. ¶ 46.) Ms. Smith was cooperative with the social worker during the meeting and agreed to a courtesy drop off at a community facility. (Id. ¶ 47.)

Between January 5 and April 4, 2019, Ms. Smith was evaluated by mental health professionals. (Id. ¶ 48.) Sometimes Ms. Smith was uncooperative. (Id. ¶ 49.) Sometimes she behaved strangely and was viewed as a danger to others. (Id. ¶¶ 50, 52.) She often refused treatment. (Id. ¶ 51.) There is no evidence that any custody staff or medical staff observed any behavior to indicate that she would harm herself. (Id. ¶ 53.) There is no evidence that Ms. Smith ever verbalized any suicidal ideations to custody staff or medical staff. (Id. ¶ 54.)

Dr. Anca Chiritescu is a licensed psychiatrist with 26 years of experience treating patients with mental illness in the United States. (Id. ¶55.) Dr. Chiritescu evaluated Ms. Smith approximately nine times between January and April 2019. (Id. ¶ 56.) Based on her observations, training, and experience, Dr. Chiritescu never determined that Ms. Smith was a danger to herself. (Id. ¶ 57.) Angela St. Croix is a licensed clinical therapist with eight years of experience treating patients with mental illness. (Id. ¶ 58.) Ms. St. Croix evaluated Ms. Smith approximately seven times between January and April 2019. (Id. ¶ 59.) Based on her observations, training, and experience, Ms. St. Croix never determined that Ms. Smith was a danger to herself. (Id. ¶ 60.)

On April 10, 2019, the day of her suicide attempt, Ms. Smith was housed in Unit 15, Segment D, Cell 4. (Id. ¶ 62.) On that day, deputies conducted safety checks of Ms. Smith's housing segment approximately every hour and they observed no issues with Ms. Smith. (Id. ¶¶ 63–66.) Deputy Van Leer last checked Ms. Smith at 3:52 p.m. and observed no issues. (Id. ¶¶ 67–68.) Ms. Smith attempted to commit suicide by hanging sometime between 3:53 p.m. and 4:28 p.m. on April 10, 2019. (Pl. Facts ¶ 24.)

At 4:28 p.m., Deputy Taack was called to Segment D and saw Ms. Smith hanging from her upper bunk. (Def. Facts ¶ 70.) Deputy Taack called for medical assistance and other deputies. (Id. ¶ 71.) Within one minute of Deputy Taack's arrival, nurses responded and began

to perform CPR and other measures on Ms. Smith. (Id. ¶ 73.) Within eighteen minutes, paramedics and the Fire Department arrived and took over medical treatment of Ms. Smith. (Id. ¶ 74.) Ms. Smith was then transported to Kaiser Hospital. (Id. ¶ 75.) She is expected to remain in a "persistent vegetative state" for the rest of her life. (Pl. Facts ¶ 26.)

During the time of Ms. Smith's incarceration at West Valley, it was SBSD policy to classify inmates for security purposes, considering their mental health needs. (Def. Facts ¶ 88.) Per policy, only mental health professionals could designate an inmate as SMIL and place her in Unit 15, the sheltered housing unit. (Id. ¶¶ 90, 92.) Deputies conducted hourly safety checks of the unit. (Id. ¶ 107.) When appropriate, mental health professionals could place an inmate in a suicide cell and order more frequent safety checks. (See id. ¶¶ 108–11.)

Plaintiffs do not dispute that there was no unlawful policy, practice, or custom that caused Ms. Smith to commit suicide. (Id. ¶ 115.) Plaintiffs admit that they did not allege a failure to train claim against the County in the FAC. (Id. ¶ 117.)

### III.     LEGAL STANDARD

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying the portions of the pleadings and record that it believes demonstrate the absence of an issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the nonmoving party bears the burden of proof at trial, the moving party need not produce evidence negating or disproving every essential element of the nonmoving party's case. Id. at 325. Instead, the moving party need only prove there is an absence of evidence to support the nonmoving party's case. Id.; In re Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir. 2010). The moving party must show that "under the governing law, there can be but one reasonable conclusion as to the verdict." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).

If the moving party has sustained its burden, the nonmoving party must then show that there is a genuine issue of material fact that must be resolved at trial. Celotex, 477 U.S. at 324. The nonmoving party must make an affirmative showing on all matters placed at issue by the motion as to which it has the burden of proof at trial. Celotex, 477 U.S. at 322; Anderson, 477 U.S. at 252. A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson, 477 U.S. at 248. "This burden is not a light one. The nonmoving party must show more than the mere existence of a scintilla of evidence." In re Oracle, 627 F.3d at 387 (citing Anderson, 477 U.S. at 252).

When deciding a motion for summary judgment, the court construes the evidence in the light most favorable to the nonmoving party. Barlow v. Ground, 943 F.2d 1132, 1135 (9th Cir. 1991). Thus, summary judgment for the moving party is proper when a "rational trier of fact" would not be able to find for the nonmoving party based on the record taken as a whole. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

### IV.    DISCUSSION

Defendants seek summary judgment in their favor on Plaintiffs' remaining claim for deprivation of civil rights under Section 1983. (See Motion.) In Monell v. Department of Social Services, the U.S. Supreme Court held that a municipality cannot be sued under a theory of respondeat superior for injuries inflicted by its employees or agents. See 436 U.S. 658, 690–91 (1978). Rather, a municipality may be liable under Section 1983 if the governmental body itself "subjects" a person to a deprivation of rights or "causes" a person "to be subjected" to such deprivation. Connick v. Thompson, 563 U.S. 51, 60 (2011) (quoting Monell, 436 U.S. at 692)). To establish municipal liability for failure to act to preserve constitutional rights, a plaintiff must show "(1) that the plaintiff possessed a constitutional right of which he was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and (4) that the policy is the moving force behind the constitutional violation." Van Ort v. Est. of Stanewich, 92 F.3d 831, 835 (9th Cir. 1996) (internal quotation marks, brackets, and citation omitted).

Here, Plaintiffs argue that Defendants failed to provide Ms. Smith with safe conditions of confinement and adequate medical care in violation of her Fourteenth Amendment rights. (Opposition at 8.) Defendants contend that there is no underlying constitutional violation, without which there can be no municipal liability. (Motion at 19.); see Villegas v. Gilroy Garlic Festival Ass'n, 541 F.3d 950, 957 (9th Cir. 2008). Even if Ms. Smith was deprived of a constitutional right—which the Court does not decide, Plaintiffs concede that no policy, practice, or custom *caused* Ms. Smith to commit suicide. (Def. Facts ¶ 115; see Reply at 12–13.) There must be "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." Villegas, 541 F.3d at 957 (quoting City of Canton v. Harris, 489 U.S. 378, 387 (1989)). Plaintiffs suggest that had Ms. Smith "been subject to additional safety checks, such as twice per half hour, she would not have had the opportunity to attempt suicide." (Opposition at 12.) But Plaintiffs offer no evidence—no testimony, expert report, or medical records—showing that Ms. Smith required additional monitoring or that such monitoring would have prevented the tragedy here. Thus, it is "undisputed" that "Plaintiffs have no admissible evidence to support that there was an unlawful policy, practice or custom that caused Ms. Smith to commit suicide." (Def. Facts ¶ 115.)

Further, Plaintiffs offer no evidence that Defendants' existing policy of requiring hourly safety checks for inmates with severe mental illness amounts to "deliberate indifference" to the inmates' constitutional rights. Deliberate indifference is a "stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Bd. of Cnty. Comm'rs of Bryan Cnty v. Brown, 520 U.S. 397, 410 (1997). A plaintiff can meet this standard in one of two ways: (1) "the policy may be so facially deficient that any reasonable policymaker would recognize the need to take action" or (2) "if the policy is not obviously, facially deficient, a plaintiff must ordinarily point to a pattern of prior, similar violations of federally protected rights, of which the relevant policymakers had actual or constructive notice." Hyun Ju Park v. City and County of Honolulu, 952 F.3d 1136, 1141–42 (9th Cir. 2020). Although Plaintiffs argue that the "risk of harm to [SMIL] inmates if only monitored once per hour . . . is

substantial and obvious," they provide no evidence in support of this proposition. (Opposition at 11–12.) They also provide no evidence of a pattern of similar incidents arising from the lack of more frequent supervision among SMIL inmates.

In all, Plaintiffs have not shown that there is a genuine issue of material fact that must be resolved at trial. Accordingly, the Court **GRANTS** summary judgment for Defendants.[5]

## V.     CONCLUSION

For the foregoing reasons, Court **GRANTS** Defendants' Motion. The March 13, 2023 hearing is **VACATED**.

**IT IS SO ORDERED.**

---

[5] Because the Court grants summary judgment for Defendants, the Court need not address Defendants' argument that SBSD is a duplicative defendant of the County. (See Motion at 18.)